Okay, let's get started with our first case, which is 25-1159 Holt v. Florissant Fire Protection District. Mr. Block. Raise this up a little bit. Good morning, your honors, and may it please the court. My name's Grady Block, I'm with Mountain States Legal Foundation, and I'm here to represent Mr. Eric Holt, who's here with us today. Respectfully, this is a little ambitious, but I'd like to try to reserve four minutes for rebuttal. I'll try to help you. All right, thank you, your honor. So we are here today because Mr. Holt was fired from his job as the fire chief of the Florissant Fire Protection District in retaliation for speaking out in the course of a criminal investigation regarding an election that happened with the board for that fire protection district. The entire board was replaced just as a little bit of background, and there was quite a bit of drama that happened along with that transition. In the course of that investigation, Mr. Holt was approached by an investigator from the district attorney's office, who asked him for footage and several questions about what was happening that day, and what was shown in the footage. Mr. Holt was enthusiastic in responding to that request. He went out of his way, went to a third-party company called Upworks to go get the footage, since they didn't actually manage the footage in-house. It was outsourced to a third-party. He went and got that footage. He met with the investigator, Mr. Kramer, and answered a lot of questions, specifically identifying who was where, the distances between things, questions that matter for elections, right? You know, there are certain regulations on how far people can be to the polls, things like that. So he was helping assist and answer those questions. He was helping provide detailed answers on what happened that day. Specifically, he actually received two complaints from citizens on the day of the election, since he happened to be at the firehouse, purely for an unrelated matter. He had nothing to do with the election, of course. He's a fire chief. Is it customary to have the fire station as a polling place for local elections? I'm not sure, Your Honor. I think it kind of makes sense. It's fitting for the Fire Protection District itself, but I'm not sure if that's customary, to be perfectly frank with you. What is important, though, is he happened to be there that day, responding to something that is absolutely within the course of his job duties. He was there to respond to an incident, a medical incident, specifically. That's what he says in his deposition. He had nothing to do with the election. The party, or the district, actually appointed a designated election official to oversee the elections. They had poll watchers. Full-blown election, right? So the court below correctly applied the Garcetti-Pickering framework to this case, but improperly decided. Let me ask you a factual question. In the inquiries that were made of him by the district attorney, were they logistical things about who was where, near the polls, and things like that? Some of it was, Your Honor. So he did relay information, you know, who was where in the fire station, and how far they would be, to his knowledge, because he's the best person to answer that, frankly. Part of it was logistical, and distances, things like that, but part of it was also relaying the citizen complaints that he received on the day of the election. So it was twofold, really. Well, threefold. So one was providing the video itself. Second, he was answering those logistical questions, and then third, he was also relaying his own complaints that he had received from citizens. And the complaints were about? That people were talking to voters within that threshold, you know, trying to get them to vote certain ways, things like that. Was the video not fully expletive of who was where in the voting area? I'm not sure, Your Honor. I haven't seen the video myself, to be perfectly honest with you. But it was helpful, obviously, to have somebody there that's intimately familiar with the fire station that can tell you how far things were, and specifically identifying who people were, as well. So it was several different categories of facts that he was rolling into that. Is he ultimately responsible for managing the fire station? Yes. I assume that he or somebody on his staff let the election workers in in the morning, and let them excuse them at night, and locked up or cleaned up after them. Sure, so he is responsible for overseeing the fire station, pretty much in its entirety. He's the only person that's a full-time employee there. He answers specifically to the board. But they don't actually manage the security system that had the footage. That was managed by a third-party vendor. Yeah, so you should move to whether what he did was within those official duties or not, under Garcetti. I wanna hear your response to the Florissant's argument on that. Absolutely, Your Honor, I would love to. So in Lane v. Franks, one of the critical questions that the Supreme Court talked about there is we look at the ordinary job duties of what that employee's charged with and doing. As a firefighter, he's charged with responding to fire incidents, responding as an EMS, managing employees and volunteers, things like that. He has nothing to do with elections, investigations, criminal investigations, anything like that. In another case on that, as well as Too Far O.V., Oklahoma Board of Regents, that case was just cited by this court in the Timmons case just a couple months ago. In that case, the court said specifically we look at the type of activities they were paid to do. And again, as a firefighter, he has nothing to do with elections investigations. Managing the firehouse, absolutely. But, yes, Your Honor. Can I ask also a factual question? Now, I understand that monitoring the video was outsourced. But the chief also did utilize, as I understand it, the digital surveillance system in order to give access to new employees. And I really wasn't quite sure, factually, what that meant. So, I'll ask it this way. Is it a fair inference that, as the fire chief, he did have control over that surveillance system, albeit for a different purpose, but it's the same digital system that underlay the entire investigation? Sure, so, as I understand it, the access system had a couple different components to it. For one, as I understand it, they used it partially as access to the building and had a function that essentially operated like a key. So, part of the login information was for that as well. But, yes, it did have the ability to access the cameras, but not necessarily the footage. So, he wouldn't be able to pull up past footage, as I'm aware of it. You could access live footage, things like that, but he had to go, actually, to that third party to get previous footage. So, you wouldn't really be able to get it in the same kind of way. But, again, moving to the... A little more on the facts. Sure. The expression, employees and staff, have been used. What employees and staff were there besides Mr. Holt? So, he was the only full-time employee. They did have a number of volunteers that worked there as well. And then, I believe, a couple part-time employees, one of which was also terminated by the board. Immediately called me. Part-time on the payroll? Yes, Your Honor, I believe so. But not full-time, so. All right. Is there anything in the record that indicates why he didn't dispatch the part-time employees to get the video? No, Your Honor, I don't think so. I think it was mostly just because he was enthusiastic about helping out and making sure that government accountability was there and present. He wanted to make sure that his new board was operating with integrity, especially in light of what their job was to do. So, in terms of that perspective they had, he was the only one who could get the video from the security company to give to the district attorney, correct? I think that's probably correct, Your Honor, but I think the district attorney could have also gone straight to the company as well. I don't think that would have been an issue. The district attorney is not an employee of the fire district, though, right? Sure, that's true. In the contract, I'm assuming, the record indicates the contract was with the fire district. That's true, Your Honor. But again, this is another interesting part of this case, is this is only the second time he had ever talked to a criminal investigator in the course of his multi-decade career. This is not something that comes up ever in his job duties, really. This is very, very unrelated to being a fire chief. If there'd been a theft in the fire station, would it be part of his official duties to cooperate with an investigation into that? I think so, probably, Your Honor. The difference is there, it's still not necessarily part of his job duties as managing a fire station, and it certainly wouldn't be relevant for a first-man retaliation context because we still have the other four factors under Garcetti we would have to look at. It could be in that case, but for this, I don't think so, because he was speaking out on a matter of public concern specifically for accountability for this potential wrongdoing. He wanted to make sure that those new officials were operating with integrity. So it's a little bit different than just a routine, kind of, something was stolen here, I'm in charge of the stuff here, I need to go report it. This is a totally separate matter from managing the firehouse. But again, our court's history has said that repeatedly as well. You look at the type of activities he was paid to do, and this isn't something that he would be paid to do. He's paid to respond to fires and manage EMS, things like that. And the fact that it comes up only twice in the course of his long career as a firefighter talking to a criminal investigator, that's telling, I believe, Your Honor. And specifically, that first time he talked to an investigator, he was responding in the course of his duties that time. He responded as EMS to a shooting incident and was relaying information about that, which, that one absolutely would be part of his job duties. This is unrelated to his job duties. And because of that, it makes it private speech and not official duties speech. With that, I think... Refresh my memory on this, on the facts. Part of the new regime involved somebody named Schultz? Yes, Your Honor, that's correct. And there was something about him, Holt, being named in a party? Yes, Your Honor. So there was a separate complaint filed by one of the outgoing board members, Starla Thompson, who filed her own separate complaint from this case. And in that response, she named him as a defendant, him being Schultz. And then Schultz, in his response to the complaint, said that Holt had improperly or illegally put in these camera systems and asked for the court, in that case, to press charges against him for that. So that's how he got brought into that case. But he was never a party in that case. And didn't he disclaim all involvement? He disclaimed that he wasn't part of the case, so he didn't really need to know about the case. How does all this play into the issues we have to resolve? If at all, maybe it's irrelevant. Sure, and I think that's probably true, Your Honor. I think that comes into whether he was protecturally fired. I'm sure you're aware of the insurance law situation. That's another issue. Right, yes, Your Honor. So I think that goes to prongs four and five of the Garcetti analysis. And the district court halted their analysis solely on prong one, which is whether it's within his official duties. And as a part of that, I don't think this court needs to reach those issues, if you don't want to. Again, in the Timmons case, you all just said that the normal favorable course is to resolve what's directly on appeal and then just remand for the rest. And I think that would be perfectly appropriate here, especially where there's factual contentions on a motion for summary judgment posture. And with that, I am a little bit past where I tried to reserve so I will save the rest of my time. Thank you. Sir, from Florissant, Ms. Cook. Good morning, Your Honors. May it please the court, I'm Sarah Cook on behalf of the Florissant Fire Protection District. Here to request that the court, this court affirm the district court's grant of summary judgment. In this case, the district court did hold that the first element of the Garcetti Pickering analysis was dispositive and thus did not reach the other four prongs. In Garcetti, the Supreme Court declined to articulate a formula for determining when a government employee speaks pursuant to his official duties. It's a case by case analysis, which the district court performed in this case based on the record before it. A speech can be pursuant to an employee's official duties, even when it concerns an unusual aspect of an employee's job that is not part of his everyday functions. Can I ask you a hypothetical question? So I work in a government building with video surveillance. I have nothing to do with that video surveillance. If there was a comparable situation, let's say there was an election in my courthouse, and let's say a law enforcement officer asked me to get that footage of the video, would that be within my job responsibilities since I work in a building with that video surveillance? And let's say hypothetically, I'm the only employee in that government building. Is that a part of my job responsibilities because I work there? And in this hypothetical, I'm assuming you have access to the video footage. No, just like the chief doesn't. Well. According to the evidence that he's presented, viewing the evidence in light most favorable to the non-movement. Sure, I mean, I think in this case, Chief Holt did have access to the video footage, but it was the stored footage. Okay, let's say, good point. So let's say they ask me, the law enforcement officer says, give me a thumb drive of that, so that he or she can view that footage rather than coming into the, say, the marshal's private arena to look at past footage. Now, would that be part of my job responsibilities? I think, yes. As an officer of the court, you would be expected to comply with a law enforcement request. I think, you know, taking it a step farther, if you refused, I think that would also be okay. You know, I mean, I don't think. Well, how can both of those things be true? If I can refuse, then it's not part of my job responsibilities. It may be something that I, as a good citizen, should do, but how can you say both that it's part of my job responsibilities and that I have the opportunity, the right to refuse? Are those not mutually exclusive? I think the term job responsibilities is what is problematic in that hypothetical. So I would not say it was part of your job responsibilities, but if you did provide it, I would say it was pursuant to your role as a public employee. And I think that is, you know, what the cases have held. What about Timmons? Isn't Timmons directly inconsistent with that? Your Honor, I'm not familiar with that case, actually. I didn't realize it was, I didn't see it cited. Oh, Timmons. I was referring to, maybe you're thinking of it as Plotkin, Timothy, Timmons versus Plotkin. And if not, don't worry about it. Yeah, I'm sorry. I'm not familiar with that case. That's okay, that's okay. You know, but in other cases, like Green versus Board of County Commissioners, where the employee was a drug lab technician for some sort of juvenile detention facility, and she was concerned that she was getting a lot of false positives, she took her concerns to her supervisors. They didn't seem to care. And so she took it upon herself to go outside and find a company to, you know, verify whether the drug tests were in fact accurate. And the court, you know, in that case, held that that conduct, that speech, was pursuant to her official duties because it was generally consistent with the type of activities she was paid to do. And here, I mean, Chief Holt admits he was in charge of the fire station. He was the fire chief, chief executive officer of the Florissant Fire Protection District. And- Doesn't the fact that he did it in his spare time effectively, he used his own money to secure some of the footage, doesn't that point towards more private conduct or private speech than part of his official duties? I mean, why would he do that if it was part of his job function? Sure, I think first, Your Honor, that those facts are not part of the record. Those facts were just raised for the first time in Mr. Holt's appellate briefing. At least my review of the record did not contain those facts. But even if that was true, I mean, as fire chief, he was technically always on duty 24-7. This is a very small fire protection district. And so even if maybe he wasn't technically scheduled for that day or whenever he went and got the video footage, I just, I think that just doesn't matter for purposes of the analysis. So your position is that this business about him using his own resources was merely assertions in the pro se briefing that was filed by Mr. Holt, and there is nowhere in the record that verifies those as being supported by evidence? That is correct. Thank you. Yes. And that, you know, this case, it was the district court reviewing the record and making the decision on the basis of the record in front of her. And that is, you know, and based on the facts in the record is what led her to determine that this was part of Chief Holt's job as a public employee. And, you know, something else with regard to, you know, he got the footage, he never told the district attorney, I want to complain about election fraud or election violations. That was, you know, never a part of, that's not a part of the record. When I took Mr. Holt's deposition, I asked him all about his conversation with the district attorney, and it was limited to the district attorney asking him how far away is this person from this person? Maybe what is this person's name? And Chief Holt answering those types of questions. Is the deposition transcript in the record? Part of it is, Your Honor, not the entire thing. If I were to get my hands on the entirety of the transcript, would it disclose that you asked him very general questions such as what did you do? What did you do then? What'd you do next? That type of inquiry? Well, with regard to his conversation with the district attorney. No, I'm directing it more about his use of his own resources in acquiring the video. That never came up. I did not ask that question. Were your questions opened in enough that it should have come up if it happened? I mean, my deposition practice is to always, you know, seek out as much information as I can. With regard to how he obtained the video footage, I just remember that as being, the district attorney called him, said, can you provide me with the footage? And he testified that he answered yes because this is a law enforcement officer, so he's gonna do what he says. And then he just went out and got the footage. Nowhere, I mean, he never said that he used his own money to maybe buy the thumb drive. Yeah, that was never brought up in deposition. How would you distinguish Lane versus Frank, which is one of their primary cases? Yes, Your Honor, I mean, Lane versus Frank, obvious, Frank's was obviously a holding about sworn in-court testimony. We don't have that. We really don't even have testimony here. We have him, Mr. Holt, answering questions about some video footage. And that's, I mean, that's how I would distinguish Lane versus Frank's, is that the holding was with regard to when a public employee provides in-courts sworn testimony. Do you think, if he'd been subpoenaed in this case, his in-court testimony would not be pursuant to his official duties? If he had been subpoenaed in the, like say the district attorney brought election fraud charges against the board. Yeah, assume that. And his testimony was limited to, hey, this person, this is this person's name, this is how far away this person was from this person. I mean, I think according to, and then if some adverse employment action had been taken because he provided that in-court testimony, yes, I think Lane versus Frank's would be persuasive to say that his testimony was private citizen speech and protected by the First Amendment. Can I ask you a somewhat general question about the intersection between the summary judgment standard and our case law that everyone agrees treats prong one of Garcetti-Pickering as a question of law. To apply that question of law, do you agree that we do have to view not only the evidence, but all the reasonable inferences from the summary judgment evidence in the light most favorable to Chief Holds? Yes, Your Honor. Okay, that's all I wanted to ask. And I mean, even if the courts were to hold that the first element of the Garcetti-Pickering analysis went in favor of Mr. Holt, this court could still affirm summary judgment on a different basis, specifically that there is no evidence of retaliatory intent and that the district would have terminated Mr. Holt even in the absence of his interaction with the district attorney's investigator. Well, you go ahead, Chuck. And that reason was because he let the insurance lapse? Yes, Your Honor. Doesn't the record indicate that he had no authority to pay for the extension of the insurance? And then, in fact, nobody had authority because the bank was not recognizing the new board's ability to sign checks? So with regard to that issue, yes, Mr. Holt could not have just written a check for the 20-some thousand dollars for that was the insurance bill. But Mr. All right, then include in your answer, why is that not good evidence of pretext? He got fired for something that he was supposed to do that he had no ability to do. Right, but the problem was is he, as fire chief, he should have presented a check to the board for signature and or he should have said, hey, this thing is due, we need to get this paid. What about the April 30th email that Ed, in the subject line, June 1st, where he circulated the invoice from the insurance company to Mr. Del Toro, the new president of the board? Right, and I think that was actually a May 30th email from Mr. Holt. Prior to the deadline. Sure, and they actually had a conversation also on May 30th and the conversation was limited to getting Mr. Del Toro to sign the uninsured waiver. Never was the fact that the insurance invoice had not been paid brought up. The invoice had been issued, I believe, like first, maybe in April. And so Mr. Del Toro assumed it had been paid. The email that Judge Bachrach asked about, was that sent before the expiration of the insurance and the grace period? It was sent, I believe, May 30th and the insurance lapsed June 1st. So apparently there was no grace period. So the new board president was aware before the expiration that there was a need to pay the insurance? He was not. He was not aware. It was his reasonable assumption that it had already been paid as the invoice was. And that equested a fact, whether that was a reasonable assumption? I mean, possibly that would be a question of fact, yes. But there were a lot of other parts to the investigation that led the board to a unanimous vote to terminate Mr. Holt on that basis. All right, I think your time's expired. Thank you. We have some rebuttal time left for Mr. Block. Mr. Block, let me ask you initially, I know this is a little awkward for you because you didn't do any of the briefing. It was all done by your client. But we have a record problem here. What do you say to Ms. Cook's statement that there is nothing in the record regarding his use of his own resources to get the thumb drive? Sure, Your Honor. So on my review of the record, I also did not see anything about him personally paying for it, to be honest. Okay, so there's nothing in the record? Not regarding him paying for it. There is evidence from his deposition that are in the cuts that were made for the summary judgment briefing that says that he had to go to the vendor to pick up the thumb drive with the footage on it. And, well, he took the thumb drive. But he had to go get the footage himself. So that is in the record. But personally paying for it with his own funds, that is not in the record. What about Ms. Cook's assertions about the statements he made to the district attorney? Sure, so there's... Is that in the record? Yes, Your Honor. There's evidence from his deposition that shows he was talking about what kinds of questions he was answering in that deposition that she took. So that is in there, Your Honor. Ms. Cook properly stated the status of the record. Regarding the first point about him paying out of his own pocket, that's accurately stated. In volume two on page 80... Oh, sorry, that's the wrong side here. In his deposition on page 57 and 58, it specifically says he was relaying citizen complaints as well. So it was more than just the logistical questions. Who was where? Who is this? So that is in the deposition, Your Honor. But to Your Honor's questions, I think the amount of factual questions we have on appellate review leads a lot of credence to the idea that this was not a case subject for dismissal at a summary judgment stage. What factual questions are you talking about regarding the first issue, and that is whether he was acting as an employee or a private citizen? What are the factual questions? So there's not as many on that prong, Your Honor. Frankly, I was more talking about the remaining factors under Garcetti. So answer my question on that prong. Sure. So on that prong, Judge Wong did say he was acting in his official capacity on the day of the election, and then seemingly uses that to say he was acting in his official capacity for the rest of it. But he was there that day specifically solely to respond to an incident, and that's when he received the information. And Lane v. Frank specifically says merely acquiring the information in the course of your employment does not automatically render that speech into employee speech rather than private citizen speech. That's a question of law, not fact, right? Correct, Your Honor. But beyond that, to Judge Backrack, your question about the judge asking for footage or providing footage, that's interesting that you break that up because there actually is a case that the appellees brought up specifically in their briefing, the Aquilina case, and they do a fantastic job describing what the district court did in that case. But on appeal, the Sixth Circuit actually reversed them and said a judge providing footage to the press, specifically in that case, actually was private speech, even though that footage happened in their courtroom. So to your question, that hypothetical has borderline been addressed by the Sixth Circuit, and they found that it was private speech, not public speech. To your point as well, Mr. Holt could have refused. There was nothing compelling him to provide this outside of wanting to make sure there was government accountability. With that. Your time's expired. Oh, I'm so sorry. Thank you very much. Thank you. Your excuse in the case will be submitted.